IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN and DEBORAH ALLISON;
JOHN ALLISON, JR. and BRENDA
MCCARRELL; MICHAEL and SHARON
ALLISON; STEPHAN and DONNA
CLARKE; GREENE TOWNSHIP, a
Municipal Corporation, RONALD HALL
a/k/a JAMES RONALD HALL; KENNETH
and TERRI HEINLEIN; PHILLIP and
BOBBIE JOHNSON; PHILLIP JOHNSON,
JR.; TERRY and DIANE MOORE;
TERRY and KIMBERLY MOORE;
RUSSELL and LINDA MORGAN; MARK
ONDRUSEK and DONNA ZYGAROWSKI;
KEVIN and DEBORAH TAYLOR;
DONALD and DIANE ANDERSON,
RICHARD and KATHERINE
MCELHANEY; and LOIS DAVIE,
     Plaintiffs/Counter-defendants,

     v.

CHESAPEAKE ENERGY
CORPORATION, a Corporation,
CHESAPEAKE APPALACHIA, LLC, a
limited liability company, CHESAPEAKE
EXPLORATION, LLC, a limited liability
company; CHK UTICA, LLC, a limited
liability company, O&G INVESTMENT
HOLDINGS, LLC, a limited liability
company, and RICHARD J. NIEDBALA,
Notary Public,
     Defendants/Counter-plaintiffs.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

United States District Judge
David Stewart Cercone

United States Magistrate Judge
Cynthia Reed Eddy

Civil Action No. 12-0900

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

A defendant has the statutory right to remove a civil action from state court if the case could have been brought originally in federal court. 28 U.S.C. § 1441(a). When removal is predicated upon diversity of citizenship, "a proper exercise of federal jurisdiction requires satisfaction of the amount in controversy requirement as well as complete diversity between the

parties, that is, every plaintiff must be of diverse state citizenship from every defendant." *In re Briscoe,* 448 F.3d 201, 215 (3d Cir. 2006) (citing *Grand Union Supermarkets of the Virgin Islands, Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003). In this case, all Plaintiffs and one Defendant, Richard J. Niedbala, are citizens of Pennsylvania.

> When a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined. But the removing party carries a heavy burden of persuasion in making this showing. It is logical that it should have this burden, for removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.

*Briscoe*, 448 F.3d at 217 (quoting *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir. 1992) (internal quotation marks and additional citations omitted)).

Defendants have failed to meet their heavy burden of proving that Mr. Niedbala was fraudulently joined in the state action in order to defeat diversity and avoid removal jurisdiction. Accordingly, the Court recommends that Plaintiffs' Motion to Remand (ECF No. 17) be granted, and the case remanded to the Court of Common Pleas of Beaver County. The pending Motions to Dismiss (ECF Nos. 3, 5) should be denied as moot.

## II.    REPORT

### A.  The State Court Complaint

**The parties**.   On June 7, 2012, John and Deborah Allison and 28 other Plaintiffs identified in the caption, all citizens of Pennsylvania and owners of land in Beaver County, filed a Complaint in the Court of Common Pleas of Beaver County, Pennsylvania, seeking a declaratory judgment, an injunction, money damages and other relief, against Defendants Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Exploration, LLC, CHK Utica, LLC, (collectively, "the Chesapeake Entities"), O&G Investment Holdings, LLC,

and Richard J. Niedbala. Complaint at ¶¶ 1-25, Exhibit A to Notice of Removal (ECF No. 1-2 at 7-9).

According to the Complaint, Chesapeake Energy Corporation, an Oklahoma corporation, is the parent of the other Chesapeake Entities, and all Chesapeake Entities are Oklahoma LLC's with principal places of business in Oklahoma; therefore, the Chesapeake Entities are citizens of Oklahoma.[1] Complaint at ¶¶ 18-22, (ECF No. 1-2 at 8-9). Defendant O&G, an Ohio limited liability corporation with its principal place of business in Ohio, is alleged to have acted at all times relevant to the Complaint through its "agents, employees, workers, associates, servants, partners and/or subsidiaries . . . within the scope of that relationship and in furtherance of the business interests of O&G . . . ." Complaint at ¶¶ 23-24, (ECF No. 1-2 at 9). Richard J. Niedbala is an "individual and Notary Public licensed . . . by the Commonwealth of Pennsylvania, Department of State, . . . ," with a principal address in Beaver Falls, Beaver County, Pennsylvania. Complaint at ¶ 25, (ECF No. 1-2 at 9).

**The leases**. The Complaint alleges that from around 2003 through 2007, O&G, through its agents, servants and workers, approached each of the Plaintiffs to sign oil and gas leases prepared by O&G, and identifies each parcel of property owned by Plaintiffs as "the subject of a purported oil and gas agreement prepared by O&G as referenced in a recording at the Beaver County Office of Recorder of Deeds . . . ." Complaint at ¶¶ 27-44, (ECF No. 1-2 at 10-14). Plaintiffs aver that O&G transferred or assigned its interests in the recorded oil and gas leases to several other corporate entities, which in turn transferred or assigned their interests in said leases

---

[1] One of the Chesapeake Entities, CHK Utica, is a Delaware limited liability company with its principal place of business in Oklahoma; the remaining Chesapeake Entities appear to be incorporated in Oklahoma, with principal places of business also in Oklahoma. A corporation is considered to be a citizen of its state of incorporation and the state where it has its "principal place of business." 28 U.S.C. § 1332(c). For purposes of diversity of citizenship, therefore, the Chesapeake Entities are citizens of Oklahoma but one, CHK Utica, is also a citizen of Delaware. *See Hertz Corp. v. Friend*, ___ U.S. ___, 130 S.Ct. 1181 (2010) (United States Supreme Court adopts "nerve center" test to determine a corporation's principal place of business, i.e., "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id*. at 1192.

to Defendant Chesapeake Appalachia in 2010, which in turn transferred and conveyed its interests in the leases to the Chesapeake Entities on or about November 1, 2011. Complaint at ¶¶ 45-47, (ECF No. 1-2 at 14-15).

**The conduct**. Plaintiffs allege the following events surrounding the obtaining and recording of the leases. Plaintiffs were each promised by O&G, acting by its authorized "agents, servants and workmen," that if the Plaintiffs signed the lease, O&G or its assignees would reasonably and timely develop the minerals on Plaintiffs' properties in order to extract the minerals and would pay royalties to each of the Plaintiffs. Complaint at ¶¶ 49-50, (ECF No. 1-2 at 15-16). O&G prepared and presented the leases to each of the Plaintiffs for their signatures, but directed all or most of the Plaintiffs to sign their respective lease "without each Lease first containing all of the material terms and conditions agreed upon and absent the presence of a notary or a witness when it was presented for signature . . . [even though O&G had] advised all or most of the Plaintiffs that they would be provided an opportunity to review their respective lease before it was notarized or recorded." Complaint at ¶¶ 52-53, (ECF No. 1-2 at 16).

Plaintiffs further allege that, as part of this scheme, "O&G, acting by and through its authorized agents, servants and workmen, notarized and recorded the said Leases prior to all or most of the Plaintiffs acknowledging their respective Leases and thereby prevented Plaintiffs from making necessary and appropriate material changes and/or modifications as agreed upon." Complaint at ¶¶ 53-54, (ECF No. 1-2 at 16). The leases contain terms of art unique to the oil and gas industry "with meaning and effects unknown to the Plaintiffs and, in some cases, contrary to that which was explained to the Plaintiffs by O&G." Complaint at ¶¶ 55, (ECF No. 1-2 at 16).

Plaintiffs complain that all or most of them were told by O&G that if they did not sign the leases, O&G and/or its agents and assigns would drill on adjacent lands and extract Plaintiffs'

minerals without paying any compensation, and that Defendants have paid minimal or no delay rentals or signing bonuses, have paid no production royalties, have assigned certain leases in direct violation of anti-assignment clauses, have not paid any shut-in royalties, have not reasonably developed the mineral resources of any of the Plaintiffs, and have not commenced any exploration, operations or production related to development of Plaintiffs' land for oil or gas resources. Complaint at ¶¶ 56-60, (ECF No. 1-2 at 16-17).

**The claims.** Based on the foregoing, Plaintiffs state the following claims.

**Count I:** Complaint for Declaratory Relief. Complaint at ¶¶ 64-79, (ECF No. 1-2 at 17-19).

Plaintiffs seek a declaration that the leases are invalid *ab initio* because they were not signed in the presence of a Notary Public, and that material terms of the leases were added or modified after signing but prior to recording, without their knowledge or consent, and are implicitly invalid because Defendants have been sitting on their rights and obligations to explore and to reasonably develop the oil and gas resources and compensate Plaintiffs for extraction of said resources.

**Count II:** Action to Quiet Title.  Complaint at ¶¶ 80-85, (ECF No. 1-2 at 20-21).

Plaintiffs claim the invalid leases place a cloud on their properties and prevent them from entering into oil and gas leases with other developers, and they seek an order directing Defendants to take such actions as necessary to clear the cloud on their title.

**Count III:** Fraudulent Misrepresentation. Complaint at ¶¶ 86-105, (ECF No. 1-2 at 21-24).

Plaintiffs claim O&G, through its agents, servants and workmen, fraudulently and intentionally misrepresented material facts to induce them to sign the leases, which were invalid

for the reasons set forth above. The Plaintiffs were not aware their leases had been altered after signature because they were not given any opportunity to review the leases prior to notarization and recording, as O&G's agents, servants and workmen promised Plaintiffs would have an opportunity to do. Plaintiffs allege that the Chesapeake Entities were aware that the leases were invalid,[2] and therefore "susceptible to being unilaterally terminated by Plaintiffs," because Plaintiffs had "recently" been approached by the other agents, servants and workmen of those entities for "ratification," "top leases," or "amendments" to the leases, in an effort "to trick the Plaintiffs into reaffirming their respective Leases in order to prohibit possible termination by Plaintiffs."

**Count IV:** Breach of Contract. Complaint at ¶¶ 106-115, (ECF No. 1-2 at 24-25).

Plaintiffs claim "the Defendants" have failed to commence operations, pay royalties, etc., and failed to acknowledge their termination of the leases following notice of termination.

**Count V:** Pennsylvania Unfair Trade Practices and Consumer Protection Law. Complaint at ¶¶ 116-119, (ECF No. 1-2 at 21-22).

Plaintiffs claim "the Defendants" continue to engage in a pattern of fraudulent and deceptive activity, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. tit. 73, §§ 201-2(4) and 201-3.

**Count VI:** Breach of Covenant of Good Faith and Fair Dealing. Complaint at ¶¶ 120-127, (ECF No. 1-2 at 23-24). Plaintiffs claim breach of the covenants of good faith and fair dealing that are implied obligations of parties to a contract.

---

[2] Plaintiffs claim the Chesapeake Entities knew or had reason to know that the leases "were materially altered, fraudulently obtained, not supported by consideration, null and void due to the failure to reasonably develop the oil and gas, [and] invalidly and unlawfully notarized and recorded. . . ." Complaint at ¶ 100, (ECF No. 1-2 at 23).

**Count VII:** Injunctive Relief. Complaint at ¶¶ 128-137, (ECF No. 1-2 at 29). Plaintiffs seek to restrain Defendants from now commencing any operations on the property while this litigation is pending.

**Count VIII:** Conspiracy to Commit Fraud, All Plaintiffs v. O&G and Richard J. Niedbala. Complaint at ¶¶ 138-147, (ECF No. 1-2 at 30-31).

Because these conspiracy and fraud averments are critical to this Court's determination of jurisdiction on Plaintiffs' motion to remand, the Court will set them out verbatim.

138. Plaintiffs incorporate by reference Paragraphs One (1) through One Hundred Thirty-Seven (137) with the same force and effect as though fully set forth at length herein.

139. Defendant, Richard J. Niedbala, at all times pertinent hereto was a Notary Public who notarized various oil and gas leases prepared by Defendant, O&G, during the years 2003 through 2007 including many of the Leases which are the subject of this Complaint.

140. It is believed and therefore averred that Defendant, Niedbala, along with Defendant, O&G, knowingly formulated a business practice which was intended to alter some of the terms of the Leases by notarizing said Leases after they had been signed by certain Plaintiffs but outside the presence of said Plaintiffs in order to enhance those terms to the benefit of Defendant, O&G.

141. It is believed and therefore averred that Defendant, Niedbala, participated in conjunction with Defendant, O&G, in fraudulent conduct designed to mislead the Plaintiffs and alter the Lease terms, i.e. adding additional parcels, altering acreages, altering the term length of some Leases, after they had already been signed by certain Plaintiffs and to the detriment of those Plaintiffs.

142. Richard J. Niedbala notarized certain of the Leases outside the presence of those Plaintiffs when those Plaintiffs actually signed the Lease in violation of his Notary License for the purpose of enhancing the terms of those Leases to benefit the Defendant, O&G, to the detriment of Plaintiffs.

143. It is believed and therefore averred that, rather than participate in the proper witnessing and notarizing of certain of the Leases. Defendant, Niedbala, was an active participant in the conspiracy orchestrated by Defendant, O&G, to mislead certain Plaintiffs and alter important property

documents after they had been executed for the benefit of both O&G and Niedbala who was working at the behest of O&G to commit a fraud upon certain Plaintiffs.

144. The conspiracy between Defendant, O&G, and Niedbala involves the direct or tacit agreement between them to deprive certain Plaintiffs of their rightful mineral resources for the benefit of O&G.

145. The conspiracy has as its purpose the advancing of O&G's business by creating the false impression that it was engaged in legitimate mineral rights negotiations, when in fact an orchestrated scheme had been implemented to deprive certain Plaintiffs of their mineral rights to enhance O&G's leaseholds and economic power in Western Pennsylvania.

146. The Defendants' conduct as alleged herein is both reprehensible and outrageous.

147. The Defendants' conduct should be deterred and punitive damages are demanded.

Complaint at ¶¶ 138-147, (ECF No. 1-2 at 30-31).

**B. The Notice of Removal**

Pursuant to 28 U.S.C. §§ 1332 (diversity jurisdiction), 1441 (removal jurisdiction), and 1446 (procedure for removal), all Defendants joined in removing the state action to this Court. Although the Complaint only indicates that Mr. Niedbala's "principal address [is] in Beaver Falls, Beaver County, Pennsylvania," the Notice of Removal adds that "Mr. Niedbala is a resident of, and domiciled in, Pennsylvania, thereby making him a citizen of Pennsylvania." Notice of Removal, ¶ 18 (ECF No. 1 at 5). Plaintiffs do not dispute that Mr. Niedbala is a citizen of Pennsylvania. Defendants argue that "Mr. Niedbala's citizenship should be disregarded on the basis that he is fraudulently joined in this matter in a transparent effort to defeat diversity jurisdiction that would otherwise exist but for his presence in the above-captioned action." Notice of Removal, ¶18 (ECF No. 1 at 5).

Defendants maintain that Plaintiffs have "no colorable claim against Mr. Niedbala, and clearly have fraudulently joined him with the intention of destroying diversity" for several reasons:

(1)     Because Mr. Niedbala's allegedly fraudulent participation in the conspiracy must have occurred between 2003 and 2007, the applicable two year statute of limitations bars Plaintiffs' claims against Mr. Niedbala. Notice of Removal, ¶ 25 (ECF No. 1 at 7);

(2)     A civil conspiracy claim in Pennsylvania requires that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means, but "Plaintiffs allege that Mr. Niedbala conspired with O&G in his capacity as an agent of O&G" and "a single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." Notice of Removal, ¶¶ 20-21 (ECF No. 1 at 5-6) (citing *Grose v. P&G Paper Prods.*, 866 A.2d 437 (Pa. Super. 2005); *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500 (Pa. Super. 1992));

(3)     "Plaintiffs have failed to allege that Mr. Niedbala acted outside the scope of his agency relationship with O&G, and therefore Mr. Niedbala cannot be individually liable for any of his actions. *See, e.g., Daniel Adams Associates, Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000-01 (Pa. Super. Ct. 1987) ('Where a party contracts with a corporation through a corporate agent who acts within the scope of his authority and reveals his principal, the corporate principal alone is liable for breach of the contract') . . . ." Notice of Removal, ¶ 24 (ECF No. 1 at 6).

### C.  Plaintiffs' Motion to Remand (ECF No. 13) - Removal Jurisdiction

Plaintiffs contend that the civil conspiracy claim against Mr. Niedbala and O&G is warranted and all of the requisite elements are satisfied by the averments of the Complaint, and that this claim is not prohibited by the statute of limitations under Pennsylvania's "discovery" and "fraudulent concealment" rules.  Accordingly, Plaintiffs assert the civil conspiracy claim is a viable claim upon which they seek relief from Mr. Niedbala and O&G, including punitive damages, and it was not conjured to destroy complete diversity; therefore, it should be decided by the state court.

### Removal generally

Although the federal judiciary is a co-equal branch of government under Article III of the Constitution of the United States, federal court jurisdiction is limited and strictly defined by Congress, and accordingly, it is a "bedrock principle that federal courts have no jurisdiction without statutory authorization." *Exxon Mobile Corp. v. Allapattah Serv., Inc.,* 545 U.S. 546, 543, 553 (2005). Removal of state court actions into federal court is governed by 28 U.S.C. Section 1441, which provides: "(a) Generally. -- Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Original jurisdiction includes diversity of citizenship pursuant to 28 U.S.C. § 1332(a).

Section 1441 must "be strictly construed against removal, *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990), so that the Congressional intent to restrict federal diversity jurisdiction is honored. This policy 'has always been rigorously enforced by the courts.'"

*Samuel–Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938)). *See also Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217 (3d Cir. 1999) (citing, *inter alia, Nelson v. Keefer*, 451 F.2d 289, 293-95 (3d Cir. 1971) (federal judiciary has been "too timid" in eliminating the "plethora of cases which do not belong in federal courts")). "Because lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts resolved in favor of remand." *Brown v. Francis*, 860, 864-65 (3d Cir. 1996) (quoting *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1985)). *See also Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir. 1992) ("In determining whether a nondiverse defendant has been fraudulently joined, all contested facts and all uncertainties as to the current state of the applicable substantive law must be resolved in the plaintiff's favor.").

Moreover, a federal court has a continuous obligation to satisfy itself of its subject matter jurisdiction, and should do so *sua sponte* if the parties have not flagged the issue. *Samuel-Bassett*, 357 F.3d at 395.  *See also Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010) ("when there is a question as to our authority to hear a dispute, 'it is incumbent upon the courts to resolve such doubts, one way or the other, before proceeding to a disposition on the merits.'") (internal citation omitted)); *Frett–Smith v. Vanterpool*, 511 F.3d 396, 399 n. 3 (3d Cir. 2008) (discussing a court's obligation to dismiss the action if at any point it discovers that it lacks subject matter jurisdiction). The Court "must always be suspicious of its subject-matter jurisdiction" because "federal courts are courts of limited jurisdiction, and there is no presumption that they have subject matter jurisdiction to adjudicate a particular case." *Martin v. Wal-Mart Stores, Inc.*, 709 F.Supp.2d 345, 346 (D.N.J. 2010) (citing Wright & Miller, 5 Fed.

Prac. & Proc. Civ. § 1206 (3d ed. West 2010)).  A federal court that entertains a case for which it has no subject matter jurisdiction commits "no mere technical violation; it is nothing less than an unconstitutional usurpation of state judicial power. Accordingly, there is a presumption that a federal court lacks subject matter jurisdiction, and the party seeking to invoke federal jurisdiction must affirmatively allege the facts supporting it." *Martin*, 709 F.Supp.2d at 346 (citing Wright & Miller, 13 Fed. Prac. & Proc. Civ. § 3522 (3d ed. West 2010)).

The defendant's right to remove is determined according to the plaintiff's pleading at the time of the petition for removal. *Angus v. Shiley*, 989 F.2d 142, 145 (3d Cir. 1993); *see also Meritcare*, 166 F.3d at 217 ("Even though actual damages may not be established until later in the litigation, the amount in controversy is measured as of the date of removal."). The district court's inquiry must focus on facts that existed at the time the complaint was filed. *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 151 (3d Cir. 2009). Accordingly, courts considering a motion for remand "must focus on the plaintiff's complaint at the time the petition for removal was filed," and "must accept as true all factual allegations in the complaint." *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). The court "also must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Batoff*, 977 F.2d at 852.

**Fraudulent joinder.**

The general rules and nuances of the fraudulent joinder doctrine have been spelled out in a trio of decisions of the United States Court of Appeals for the Third Circuit. *Briscoe*, 448 F.3d 201 (3d Cir. 2006) ("We will briefly review *Batoff*, *Boyer*, and *Abels*, . . . [the] three decisions of this court in which we have developed our fraudulent joinder jurisprudence"). The doctrine of fraudulent joinder allows the district court to "disregard, for jurisdictional purposes, the

citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Briscoe*, 448 F.3d at 216 (citing *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir.1999)). Joinder is fraudulent if "there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendant or seek a joint judgment." *Briscoe*, 448 F.3d at 215 (quoting *Abels,* 770 F.2d at 32).

The removing party "carries a heavy burden of persuasion in making this showing. It is logical that it should have this burden, for removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand." *Briscoe*, 448 F.3d at 217 (quoting *Batoff*, 977 F.2d at 851-52). If there is "even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court . . . ." *Id*. In making this determination, the "district court must resolve all contested issues of substantive fact in favor of the plaintiff and must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Boyer*, 913 F.2d at 111 (citations omitted)

Unless the claims against the non-diverse defendant can be deemed "wholly insubstantial and frivolous" as a matter of law, joinder of the non-diverse defendant cannot be deemed fraudulent, and in making this determination, the district court must take care not to stray too close to the merits. *Id*. This point was emphasized in *Boyer*, which held that it was improper for the district court to reach the merits of the otherwise colorable claims against the non-diverse defendants, and that the district court, "in the guise of deciding whether the joinder was fraudulent, stepped from the threshold jurisdictional issue into a decision on the merits . . . ." *Briscoe*, 448 F.3d at 218 (quoting *Boyer*, 913 F.2d at 112-13). The determination of the merits

of claims and defenses must be left to the state court if the facts alleged do not satisfy the jurisdictional threshold.

In *Abels*, the named defendants argued that John Doe defendants had been inserted into the state court complaint to defeat diversity jurisdiction. Even though it found the claims against the Doe defendants to be somewhat dubious, the Court of Appeals held that the district court "must first 'ask whether, on the face of the complaint, there are sufficient allegations concerning [the Doe defendants'] identity and conduct to justify consideration of their citizenship,' and, second, we must 'look beyond the face of the complaint for indicia of fraudulent joinder.' . . . Because the plaintiffs' complaint identified the Doe defendants with specificity and raised express claims against them, we found the allegations sufficient to defeat diversity jurisdiction." *Briscoe*, 448 F.3d at 219 (quoting *Abels*, 770 F.2d at 29).

Being cautious not to step across the jurisdictional threshold into an inquiry on the merits, and assuming the truth of the factual averments, as we must, this Court finds that there is a colorable and reasonable basis for the civil conspiracy claim against Mr. Niedbala and O&G, and that Plaintiffs have offered a plausible basis for overcoming the statute of limitations defense.

### D. Discussion

#### 1. The statute of limitations

A "statute of limitations defense is properly considered in connection with a fraudulent joinder inquiry." *Briscoe*, 448 F.3d at 219 (citing *LeBlang Motors, Ltd. v. Subaru of Am., Inc.,* 148 F.3d 680, 690 (7th Cir. 1998)). Given that Mr. Niedbala's alleged fraudulent conduct took place between 2003 through 2007, Plaintiffs' claims appear to have a statute of limitations problem. (The statute of limitations for civil conspiracy is two years. 42 Pa.C.S. § 5524(7);

*Kingston Coal Co. v. Felton Mining Co., Inc.*, 690 A.2d 284, 287 (Pa. Super. 1997)). Upon consideration of Pennsylvania's equitable tolling nuances, however, that appearance is dispelled.

Pennsylvania excuses strict enforcement of the passage of the statute of limitations period from the time of occurrence when a plaintiff could not have, in the exercise of reasonable diligence, discovered the injury sooner, and where defendants have fraudulently concealed the injury or their involvement from the plaintiff. As the United States Court of Appeals for the Third Circuit summarized:

> Over the years, Pennsylvania courts have developed certain tolling principles to "ameliorate the sometimes-harsh effects" of the statute of limitations. . . . The discovery rule tolls the statute of limitations when a plaintiff, despite the exercise of due diligence, is unable to know of the existence of the injury and its cause. . . .
>
> Under the most recent restatement of the discovery rule, the statute of limitations begins to run as soon as "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." . . .
>
> The "polestar" of the discovery rule is not the plaintiff's actual knowledge, but rather "whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff." . . . The statute of limitations begins to run as soon as the plaintiff has discovered or, exercising reasonable diligence, should have discovered the injury and its cause.
>
> As a corollary to the discovery rule, Pennsylvania courts have developed the doctrine of fraudulent concealment. This doctrine tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from the right of inquiry." . . . Fraudulent concealment may be intentional or unintentional; however, "mere mistake, misunderstanding, or lack of knowledge is insufficient." . . . There must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury. . . .
>
> When fraudulent concealment is established, "the statute [of limitations] is tolled until the plaintiff[ ] knew or using reasonable diligence should have known of . . . the claim." . . . In other words, "the Supreme Court [of Pennsylvania] views tolling the statute of

> limitations in terms of the 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment." . . . Thus, the inquiry under the fraudulent concealment doctrine is the same as that under the discovery rule.

*Bohus v. Beloff*, 950 F.2d 919, 925-26 (3d Cir. 1991) (numerous citations omitted).

Plaintiffs allege that O&G prepared and presented the leases to each of them for their signatures, but directed them to sign even though the leases did not contain all of the material terms and conditions agreed upon, and that O&G had advised plaintiffs that they would be provided an opportunity to review their respective lease before it was notarized or recorded. Plaintiffs also allege that "O&G, acting by and through its authorized agents, servants and workmen, notarized and recorded the said Leases prior to all or most of the Plaintiffs acknowledging their respective Leases and thereby prevented Plaintiffs from making necessary and appropriate material changes and/or modifications as agreed upon." Complaint at ¶¶ 52-54, (ECF No. 1-2 at 16). Plaintiffs further claim that they had no knowledge that the leases had in fact been modified, notarized and recorded until Chesapeake Entities' agents "recently" started to come around to get them to sign "top leases," or "amendments" to the leases in order to "trick" them into reaffirming their respective leases and prevent possible termination by plaintiffs.

This Court "must focus on the plaintiff's complaint at the time the petition for removal was filed," *Steel Valley Auth.*, 809 F.2d at 1010, "must accept as true all factual allegations in the complaint," *id.*, and "must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." *Batoff*, 977 F.2d at 852. Viewed in light of those standards, and mindful not to step too close to the merits line, the Court finds that plaintiffs have averred sufficient facts to be able to plausibly invoke the discovery rule and the fraudulent

concealment doctrine, which would abrogate strict application of the two year statute of limitations.

Defendants place much reliance on the fact that the leases were recorded, and that the purpose of the recording statutes and system is to provide public notice to the world. Therefore, Plaintiffs were on public notice upon recordation of the leases, and the statute of limitations must commence running no later than the dates of recording. Although this argument has some superficial appeal, it evaporates under the actual circumstances and scheme alleged.

O&G's agents and workmen had assured Plaintiffs they would have an opportunity to review, modify and sign the leases before a notary before they were recorded. Assuming the truth of Plaintiffs' allegations, O&G's scheme concealed the fact that the altered and unauthorized leases had been notarized and recorded. Reasonably diligent persons would have had no reason to search the public records until Chesapeake Entities' agents started to come around seeking amendments and top leases, at which point Plaintiffs' curiosity was piqued.

### 2. Civil conspiracy - "single entity"

Defendants contend that, in Pennsylvania, a single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves. Notice of Removal, ¶¶ 20-21 (ECF No. 1 at 5-6). Therefore, because Plaintiffs allege that Mr. Niedbala was an "agent" for O&G because he acted "on its behest" in violating his oath as a Notary Public, he cannot have conspired with the principal to commit the fraud. This argument is without merit.

First, Defendants read too much into Plaintiffs' complaint. The Complaint does not allege Mr. Niedbala, a Pennsylvania Notary Public, had any previous business relationship with O&G, an Ohio corporation, nor that he was employed by or had any kind of on-going agency relationship with O&G. Rather, the complaint alleges Mr. Niedbala acted to benefit O&G and

himself, at O&G's "behest," in participating in the fraudulent scheme in a very specific way, by notarizing the leases, and it does not allege or imply that Mr. Niedbala was one of O&G's "agents, servants or workmen" who signed Plaintiffs up for the leases. In a very broad sense, perhaps, every conspirator could be considered an "agent" of the overarching conspiracy. Defendants' position would seem to require that any person enlisted into a conspiracy necessarily becomes an "agent," and therefore he cannot be a conspirator because there is only a single entity, but this cannot be right.

Second, it would be stepping into the merits for this Court to determine Mr. Niedbala's exact status vis-à-vis O&G, and whether one in that status would be able to participate in a conspiracy within a "single entity." Pennsylvania's "single entity" prohibition is not iron-clad, and its courts have recognized that, in the right set of circumstances, conspiracy may occur within a single entity. *See, e.g., Morelia Cons., LLC v. RCMP Ent., LLC,* 2011 WL 4021070, *11 (M.D. Pa. 2011) ("plaintiffs have raised allegations sufficient to pierce the corporate veil. As such, the intra-corporate conspiracy doctrine [i.e., an entity cannot conspire with one who acts as its agent] does not apply to the case.") (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co*., 337 F.3d 297, 313 (3d Cir. 2003)); *Rife v. Bor. of Dauphin,* 625 F.Supp.2d 212, 222 (M.D. Pa. 2008) ("even if the court were to extend [Pennsylvania's] intracorporate conspiracy doctrine, the Plaintiff could, nonetheless, allege a claim against Individual Defendants to the extent they were motivated by an independent personal stake. Whether Individual Defendants were motivated by independent personal stake is a factual issue not appropriately resolved at the pleadings stage."); *Simms v. Exeter Arch. Prod., Inc*., 868 F.Supp. 677, 682 (M.D. Pa. 1994) ("The Pennsylvania Superior Court . . . has recognized that a conspiracy may occur within a single entity.") (citing *Gordon v. Lancaster Osteopathic Hosp. Assoc.*, 489 A.2d 1364 (Pa. Super. 1985)); *Denison v.*

*Kelly*, 759 F.Supp. 199, 206 (M.D. Pa. 1991) ("It may be possible for two or more employees of a corporation to conspire").

*PoppedA Festival, Inc. v. Live Nation Worldwide, Inc*., 2010 WL 571781 (E.D. Pa. 2010) is illustrative. In the *Live Nation* case, the District Court for the Eastern District of Pennsylvania found it lacked diversity removal jurisdiction because not all of the Defendants were diverse from the Plaintiff, a festival promoter. Plaintiff alleged that two Pennsylvania citizen Defendants, acting as shareholders, agents, workmen, servants, and/or employees of Defendant Live Nation Worldwide, Inc., engaged in a civil conspiracy against it with Live Nation. Rejecting the removing Defendants' intracorporate conspiracy argument (a "single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves"), the Court noted the exception to that general rule, that when "corporate agents or employees act on their own behalf, they are legally capable of an intracorporate conspiracy." 2010 WL 571781 at *4 (citation omitted). The "possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants [meant] Defendant Live Nation failed to establish that Plaintiff fraudulently joined" the individual Pennsylvania Defendants. *Id*., at *5. Therefore, that Court granted Plaintiff's motion to remand, pursuant to 28 U.S.C.S. § 1447(c).

### 3. Civil conspiracy – "agent within scope of authority"

Related to the previous argument, Defendants contend that Plaintiffs failed to allege that Mr. Niedbala acted outside the scope of his agency relationship with O&G, and therefore he cannot be individually liable for any of his actions. As noted above, it is far from clear, and it would be improper for this Court to determine, the "scope of his agency relationship," if any, and whether Mr. Niedbala acted outside of it. Those are matters going to the merits of a defense, and

resolving those matters will involve intense factual investigation beyond the limited scope of the fraudulent joinder inquiry.

The essential elements of a claim for Pennsylvania common law civil conspiracy are: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008). Plaintiffs' complaint adequately alleges all of these essential elements. To the extent "agent within the scope of his agency relationship" may be a defense, neither the Notice of Removal nor Defendants' Joint Response in Opposition to Plaintiffs' Motion for Remand (ECF No. 24) persuade this Court that there is no reasonable basis in fact or colorable ground supporting Plaintiffs' civil conspiracy claims, or that there is not "even the possibility" of prevailing in state court on this cause of action.

Furthermore, under Pennsylvania's "participation" theory, a corporate officer, employee or agent may in fact be held liable for his or her own tortious conduct committed in the scope of employment. *Greenberg v. Macy's,* 2011 WL 4336674, *4 (E.D. Pa. 2011) (quoting, *inter alia*, *Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 89–90 (Pa. 1983)). *See also Boyer*, 913 F.2d at 112 ("Under Pennsylvania law there is a cause of action against employees whose fraud and misrepresentations contributed to plaintiff's damages, even if these actions were taken in the course of their employment."); *Moore v. Johnson & Johnson,* --- F.Supp.2d ----, 2012 WL 5363123, *13 (E.D.Pa. 2012) ("Pennsylvania law recognizes that managers of a corporation may be held liable for torts committed by the corporation under the participation theory.") (citing *Wicks*, 470 A. 2d at 90)); *Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434, *15 (E.D. Pa. 2002) ("Participation theory, in simple terms, is a theory which imposes personal liability on

corporate officers or shareholders where they have personally taken part in the actions of the corporation.") (citing *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601 (Pa.Super. 1991).

## III.  CONCLUSION

"The Third Circuit has emphasized that proper joinder for jurisdictional purposes is a lower bar than would be required for a claim to survive a motion to dismiss, . . or a motion for summary judgment . . . . *Burnett v. Chesapeake Appalachia, LLC*, 2011 WL 3876412, *3 (M.D. Pa. 2011) (citing *Batoff*, 977 F.2d at 852 and *Boyer*, 913 F.2d at 111).[3] Given a removing defendant's heavy burden of showing fraudulent joinder, which assumes the truth of the substantive factual averments, "[f]raudulent joinder should not be found simply because plaintiff has a weak case against a non-diverse plaintiff." *Burnett*, 2011 WL 3876412, *3 (citing *Boyer,* 913 F.2d at 111). Here, Plaintiffs' case cannot be characterized as weak, insubstantial or implausible; on the contrary, the Complaint states a colorable claim and has a reasonable basis in law and fact for the civil conspiracy claim against Mr. Niedbala and O&G.

---

[3] In *Burnett*, the district court held that the Pennsylvania citizens' tort claims against a Pennsylvania corporation, Diamond Y, a wholly owned subsidiary of Chesapeake Appalachia, were not wholly insubstantial, and were not included in the suit for damage to their property caused by toxic wastewater solely to defeat diversity jurisdiction, stating:

> At the very least, Diamond Y was involved in the day to day operations at the wells. Chesapeake claims this involvement was minimal, and solely related to the transportation and the moving of equipment. But resolving this question would involve an intense factual investigation beyond the limited scope of the fraudulent joinder inquiry. Given the allegations and Diamond Y's acknowledged involvement, the Court cannot say that recovery from the company would be a legal impossibility. Therefore, the motion to remand will be granted.

*Burnett*, 2011 WL 3876412, *3.

For the foregoing reasons, Defendants have not met their heavy burden of persuasion by demonstrating that the non-diverse party, Mr. Niedbala, was fraudulently joined to defeat diversity jurisdiction. Therefore, it is respectfully recommended that the District Court deny Defendants' motions to dismiss as moot, grant Plaintiffs' motion to remand, and remand to the Court of Common Pleas of Beaver County for further proceedings.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, Objections to this Report and Recommendation are due by February 15, 2011. Failure to timely file Objections will constitute waiver of any appellate rights. *Brightwell v. Lehman,* 637 F.3d 187, 193 n.7 (3d Cir. 2011).

<u>s/ Cynthia Reed Eddy</u>
Cynthia Reed Eddy
United States Magistrate Judge

cc: all counsel listed on ECF